JUL 8 2026 AM 9:24
FILED - USDC - FLMD - TPA

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

BAMIDELE OLATUNBOSUN, M.D.,

8:26-CV-1948-WFJ-CPT

Plaintiff,

ARCHWELL HEALTH MEDICAL OF FLORIDA, LLC,

ARCHWELL HEALTH, LLC, and

ARCHWELL HEALTH PROFESSIONAL SERVICES OF FLORIDA, P.A.,

Defendants.

_____/

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION, RETALIATION, HOSTILE WORK ENVIRONMENT, AND BREACH OF CONTRACT

## DEMAND FOR JURY TRIAL

Plaintiff Bamidele Olatunbosun, M.D. ("Dr. Olatunbosun" or "Plaintiff"), proceeding pro se, brings this action against Defendants ArchWell Health Medical of Florida, LLC, ArchWell Health, LLC, and ArchWell Health Professional Services of Florida, P.A. (collectively "ArchWell" or "Defendants"), and alleges as follows:

## I. JURISDICTION AND VENUE

TPA 74547
84405.

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 2000e-5(f)(3) (Title VII), and 42 U.S.C. § 1981 (Section 1981 of the Civil Rights Act of 1866).

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative facts as the federal claims.

3. Venue is proper in the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices alleged herein occurred within this District, specifically at 4520 East Bay Drive, Clearwater, Florida 33764.

## II. PARTIES

4. Plaintiff Bamidele Olatunbosun, M.D. is a Black male physician of Nigerian national origin. He is a board-certified family medicine physician licensed in the State of Florida (License No. ME148937) and holds a valid, unrestricted DEA certificate (No. FO5917995). He resides at 2905 W. Fountain Blvd., Tampa, Florida 33609.

5. Defendant ArchWell Health Medical of Florida, LLC is a limited liability company organized under Florida law with its principal offices located at 102 Woodmont Blvd., Suite 600, Nashville, TN 37205. At all relevant times, this entity was Plaintiff's direct employer of record, as confirmed by Plaintiff's pay stubs identifying "ArchWell Health Medical of Florida, LLC" as the issuing employer, and as the contracting party to Plaintiff's Physician Employment Agreement executed July 21, 2025. This entity is referred to herein as "Defendant Employer."

6. Defendant ArchWell Health, LLC is a limited liability company with its principal offices at 102 Woodmont Blvd., Suite 600, Nashville, TN 37203. At all relevant times, this entity served as the parent management company that directed, controlled, and supervised the operations of ArchWell Health Medical of Florida, LLC. Section 7.1(a) of Plaintiff's employment agreement explicitly identifies ArchWell Health, LLC as the "management company" that "developed and maintained" the medical practice and business model under which Plaintiff was employed. Donald Goddard, M.D., who signed Plaintiff's termination letter as President, acted on behalf of this entity. This entity is referred to herein as "Defendant Parent."

7. Defendant ArchWell Health Professional Services of Florida, P.A. is a professional association organized under Florida law with its principal address at 102 Woodmont Blvd., Suite 600, Nashville, TN 37203. Upon information and belief, this entity served as the professional entity through which Plaintiff's medical services were billed to third-party payors and through which Plaintiff's credentialing relationships with managed care organizations were maintained. This entity is referred to herein as "Defendant Professional Services."

8. At all relevant times, Defendants collectively constituted an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), and the Florida Civil Rights Act, Fla. Stat. § 760.02(7), as they employed fifteen (15) or more employees -- the EEOC charge identifies 1,900 employees -- for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

9. At all relevant times, Defendants operated as an integrated enterprise with unified control over labor relations and employment decisions affecting Plaintiff. All three Defendants share identical addresses and telephone numbers, reflecting common ownership and centralized management. Defendant Parent directed and controlled the employment policies, operational decisions, and personnel actions of Defendant Employer and Defendant Professional Services. All three entities are jointly and severally liable for the unlawful employment practices alleged herein. Where this Complaint refers to conduct by "Defendants" or "ArchWell," it refers to the collective acts of all Defendants acting through their officers, employees, and agents, including specifically: Donald Goddard, M.D. (President, acting on behalf of Defendant Parent and Defendant Employer); Dr. Emmanuel Ammisseh (Regional Medical Director); Tiffany Knight (Center Manager); and Nicole Orner (HR Representative).

### III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiff timely filed charges of discrimination, hostile work environment, and retaliation with the United States Equal Employment Opportunity Commission ("EEOC") against all three Defendants. The EEOC assigned Charge No. 511-2026-02730 against Defendant ArchWell Health Medical of Florida, LLC; Charge No. 511-2026-02731 against Defendant ArchWell Health, LLC; and Charge No. 511-2026-02732 against Defendant ArchWell Health Professional

Services of Florida, P.A. All three charges were filed on April 3, 2026 and allege race discrimination, hostile work environment, and retaliation in violation of Title VII, 42 U.S.C. § 1981, and the Florida Civil Rights Act.

11. The EEOC issued three Notices of Right to Sue, one for each charge, all dated April 16, 2026. Plaintiff received said Notices on or about April 16, 2026. Copies of the three Notices of Right to Sue are attached hereto as Exhibit A-1 (Charge No. 02730), Exhibit A-2 (Charge No. 02731), and Exhibit A-3 (Charge No. 02732).

12. This Complaint is filed within ninety (90) days of Plaintiff's receipt of the Notices of Right to Sue. All administrative prerequisites to filing suit under Title VII and the Florida Civil Rights Act have been satisfied as to all three Defendants.

## IV. STATEMENT OF FACTS

### A. Plaintiff's Background and Qualifications

13. Plaintiff Bamidele Olatunbosun, M.D. is a board-certified family medicine physician who graduated from Wake Forest University School of Medicine in 2010 and completed his family medicine residency at the Institute for Family Health -- Mount Sinai Program in Harlem, New York in 2016. He also holds a Master of Business Administration from the University of North Carolina at Chapel Hill (2011-2013).

14. Plaintiff holds an active, unrestricted Florida medical license (ME148937) and an active, unrestricted DEA certificate (FO5917995).

15. Prior to his employment with Defendants, Plaintiff practiced medicine in California, Alaska, and Florida, and operated his own solo practice, Just Medical Care, in Temple Terrace, Florida from 2021 to 2025, maintaining an active patient panel of approximately 400 patients.

### B. The CVS Prescribing Restriction -- Background

16. In December 2024, CVS Health implemented internal prescribing restrictions on certain physicians as part of a broad, algorithmically-driven response to DOJ opioid litigation. Plaintiff was among the physicians restricted. This restriction was a unilateral private business decision by CVS Health and had no connection whatsoever to Plaintiff's Florida medical license or DEA certificate, both of which remained fully active and unrestricted at all times.

17. At the time of the CVS restriction, Plaintiff's solo practice included approximately 20 to 30 patients receiving controlled substance prescriptions out of an active panel of approximately 400 patients -- representing approximately 5% to 7.5% of his patient population. These patients received regular drug testing, imaging, specialist referrals, and active weaning protocols.

18. No state medical board, the DEA, or any governmental or professional regulatory body took any action against Plaintiff in connection with the CVS restriction or his prescribing practices at any time.

## C. Plaintiff's Hiring and Credentialing by Defendant Employer

19. In July 2025, Plaintiff accepted a position with Defendant Employer as a primary care physician at its Largo/Clearwater center located at 4520 East Bay Drive, Clearwater, Florida 33764. The Physician Employment Agreement was signed by both parties on July 21, 2025, with Defendant Employer as the contracting party.

20. Under the employment agreement, Plaintiff was entitled to an annual base salary of $285,000, potential incentive compensation of up to 20% of base salary ($57,000), and a $20,000 sign-on bonus. Plaintiff's bi-weekly pay stubs confirm the employer of record as ArchWell Health Medical of Florida, LLC under employee number AWH3780.

21. During Defendants' credentialing process, Plaintiff was never asked about any pharmacy network relationships, pharmacy restrictions, or his ability to prescribe to any specific pharmacy chain. No CVS-related question of any kind was posed to Plaintiff during credentialing.

22. Plaintiff proactively disclosed a 2011 North Carolina medical license denial during the credentialing process. Defendants hired Plaintiff with full knowledge of this prior disclosure.

23. Exhibit C of the employment agreement -- the exceptions exhibit -- was left entirely blank. Plaintiff was never shown, explained, or asked to complete Exhibit C. Defendants' credentialing process did not prompt or request disclosure of pharmacy network restrictions.

24. Plaintiff commenced employment on September 22, 2025, as reflected in his pay stubs, and commenced active patient care at the Largo/Clearwater center thereafter.

## D. Hostile Work Environment -- Racial Animus

25. At all relevant times, Plaintiff was the only Black male Nigerian physician at Defendants' Largo/Clearwater center. His direct supervisor was Dr. Emmanuel Ammisseh (of Ghanaian descent), Regional Medical Director. His fellow physician was Dr. John-Rose Brown (of Caribbean origin).

26. Before any conflict arose between Plaintiff and the medical assistants, Dr. John-Rose Brown warned Plaintiff that Gates Philpott, a float medical assistant, had a pattern of instigating conflicts with colleagues and had caused Dr. Brown professional harm through similar conduct.

27. Plaintiff's primary assigned medical assistant was Tanya M. Beginning in early November 2025, Tanya frequently took unauthorized smoke breaks, disappeared during patient visits, questioned Plaintiff's clinical decisions, and failed to complete assigned tasks.

28. On November 6, 2025, Plaintiff texted Dr. Ammisseh stating: "I don't think Tanya is a good fit for me as an MA. I can work with her temporarily but I think long term I was hoping for a better MA." Dr. Ammisseh responded: "Yes."

29. On November 10, 2025, Plaintiff texted Center Manager Tiffany Knight regarding Tanya's ongoing performance issues. Ms. Knight completely agreed, responding: "I completely agree with you, I have spoken with her numerous times about this and not seeing improvement. I'm also going to sit back there more often after I speak with her." Ms. Knight further stated that the situation with Tanya was "heading towards a PIP" (Performance Improvement Plan). At Ms. Knight's request, Plaintiff submitted a formal email complaint on the same date documenting Tanya's conduct.

30. In mid-November 2025, Gates Philpott disclosed to Plaintiff that Tanya had been abused by a Black man in the past and that due to this trauma, Tanya felt intimidated by her interactions with Plaintiff. Another White medical assistant separately told Plaintiff to "take it easy on" Tanya because she "had been harmed by a Black man previously."

31. This disclosure established a racially charged dynamic in which Plaintiff's ordinary professional communications were filtered through a medical assistant's trauma response specifically directed at Black men. Defendant Employer's management became aware of this dynamic but took no action to address it or to protect Plaintiff from its consequences.

32. From mid-November 2025 onward, medical assistants -- including Tanya, Gates Philpott, and Prescilla Trauger (White) -- repeatedly complained about Plaintiff's "tone," "body language," "head movements," and "body gestures," characterizing his normal professional conduct as threatening or intimidating. Management adopted and credited these characterizations without investigation.

33. On December 26, 2025, Plaintiff walked to Prescilla Trauger's desk to obtain a patient's phone number. Trauger subsequently filed a formal complaint stating Plaintiff had "intimidated her by standing over her desk." Trauger was granted a day off in response to this complaint. No comparable relief was provided to Plaintiff in response to his documented complaints about Tanya's clinical failures.

34. On January 15, 2026, Gates Philpott refused to recheck a critically elevated blood pressure reading of 204/79 mmHg in an 87-year-old patient with atrial fibrillation, hypertension, osteoporosis, cardiac murmur, and type 2 diabetes. Ms. Philpott also failed to draw required laboratory work for this patient. Plaintiff documented this clinically dangerous insubordination via Microsoft Teams and provided screenshots to Dr. Ammisseh as evidence.

35. At various times during his employment, medical assistants including Gates Philpott made statements to Plaintiff including "You won't be here in a month" and "We were doing better without you."

**E. Plaintiff's Protected Complaints and Defendants' Failure to Investigate**

36. On January 9, 2026, Plaintiff texted Dr. Ammisseh stating he felt "under constant threat" and was experiencing a "hostile work environment," and noting that the repeated complaints about his "tone" might be "because I'm a Black man."

37. On January 17, 2026, Plaintiff sent a formal email to Dr. Ammisseh and Center Manager Tiffany Knight reporting "constant harassment in the workplace" and providing documentary evidence including Microsoft Teams screenshots of Gates Philpott's insubordinate conduct. This formal written complaint constitutes protected activity under Title VII, the Florida Civil Rights Act, and 42 U.S.C. § 1981.

38. On January 20, 2026, Plaintiff met with Ms. Knight and Dr. John-Rose Brown and formally stated that he was "being harassed every day." Ms. Knight's response was that "the situation was [Plaintiff's] fault too because of his body language and head movements." No corrective action was taken. No HR investigation was ever initiated.

39. Throughout Plaintiff's entire employment, Human Resources played no role in addressing his harassment complaints. HR was never contacted about Plaintiff's complaints despite multiple documented formal reports. HR representative Nicole Orner appeared for the first time at Plaintiff's termination meeting on February 13, 2026.

## F. Defendants' Discovery of the CVS Restriction and Continued Employment

40. Plantiff had two issues with prescribing to CVS. One involved being on call in late December and prescribing a controlled substance for a patient that was denied by CVS and another involving what was possibly a drug seeking opioid patient that only wanted her medications to be sent to CVS.

41. In early January 2026, Dr. Ammisseh asked Plaintiff about the CVS issue. Plaintiff explained the CVS restriction and informed Dr. Ammisseh that he had a meeting scheduled with CVS on January 27, 2026 to discuss reinstatement. Dr. Ammisseh's response was: "That's fine."

42. Following Dr. Ammisseh's expression that the CVS situation was "fine," Defendants took no adverse employment action, issued no written warning, did not suspend Plaintiff, and did not communicate any concern about Plaintiff's job security related to the CVS restriction.

43. On January 27, 2026, Plaintiff participated in a telephone interview with three CVS representatives regarding reinstatement. Plaintiff confirmed his rare controlled substance prescribing at Defendant Employer's center and described Defendants' institutional policies.

44. From February 4 through February 6, 2026 -- one week before Plaintiff's termination -- Defendants flew Plaintiff to Nashville, Tennessee to attend a company-wide physician orientation at Defendants' expense. Defendants' investment in this multi-day orientation for Plaintiff is fundamentally inconsistent with a legitimate, pre-existing operational decision to terminate his employment.

## G. Plaintiff's Termination

45. On the morning of February 12, 2026, Plaintiff observed that Tanya spent approximately 30 minutes on a clinical task that should have required 5 minutes, causing patient care delays. Plaintiff raised this concern through appropriate channels. That same morning, Tanya filed another complaint against Plaintiff.

46. That evening, February 12, 2026, Dr. Ammisseh called Plaintiff by telephone and instructed him not to report to work the following day.

47. On February 13, 2026 -- twenty-seven (27) days after Plaintiff's formal written harassment complaint of January 17, 2026 -- Defendant Employer terminated Plaintiff's employment via Microsoft Teams. The termination meeting was conducted by Dr. Ammisseh and HR representative Nicole Orner, who had no prior involvement in Plaintiff's employment or his harassment complaints.

48. The sole stated reason for termination in the termination letter, signed by Donald Goddard, M.D. as President on behalf of Defendant Employer, was Plaintiff's alleged failure to disclose the CVS controlled substance prescribing restriction, citing Section 6.3(b) of the employment agreement. The termination letter makes no reference to staff complaints, patient care performance, or any other basis for termination.

49. During the termination meeting, Plaintiff stated clearly that he did not believe he was required to disclose the CVS restriction and that he believed the termination was in retaliation for

his harassment complaints. When Plaintiff asked about his prorated 2025 incentive bonus, HR representative Nicole Orner declined to respond.

50. When Plaintiff raised his documented harassment complaints during the termination meeting, management claimed they "never knew anything about" his complaints -- a statement directly contradicted by the documented texts, emails, and meetings described herein.

## H. Defendants' Shifting and Pretextual Justifications

51. Defendants' stated reason for termination has shifted materially across communications. The February 13, 2026 termination letter, signed by Donald Goddard, M.D. on behalf of Defendant Employer, cites only Section 6.3(b) of the employment agreement. Defendants' outside counsel subsequently represented verbally that the termination was actually under Section 6.3(j) -- a different contractual provision not mentioned in the termination letter. These inconsistent and shifting justifications are evidence of pretext.

52. Section 6.3(b) of the employment agreement provides grounds for immediate termination if Plaintiff's representations and warranties under Section 2.3 "are false or incorrect when made or hereafter become false or incorrect." Section 2.3(c) requires disclosure only if Plaintiff's "license to practice medicine or prescribe controlled substances" has been restricted. The CVS restriction is a unilateral private business decision by a retail pharmacy and does not constitute a restriction on Plaintiff's medical license or DEA-issued prescribing authority. Both remained fully active and unrestricted at all times.

53. Section 2.3(i) of the employment agreement requires disclosure if Plaintiff's "status as a participating provider in a managed care organization" has been restricted. CVS Health is a retail pharmacy chain, not a managed care organization, hospital, or medical staff body. The CVS restriction does not trigger Section 2.3(i).

54. Defendant Employer learned of the CVS restriction in early January 2026, yet continued Plaintiff's employment, paid him, and flew him to company-wide orientation in Nashville from February 4 through 6, 2026 -- one week before terminating him. If the CVS restriction constituted a legitimate operational basis for termination, this conduct is inexplicable.

55. The stated termination reason -- the CVS prescribing restriction -- predated Plaintiff's employment by approximately six months, was known to Defendants' management by early January 2026, and was expressly accepted by Plaintiff's direct supervisor as "fine." The termination occurred 27 days after Plaintiff's formal harassment complaint, on the same day a medical assistant who had been the subject of multiple documented complaints filed yet another complaint against Plaintiff. The temporal proximity between Plaintiff's protected activity and his termination raises a strong inference of retaliation.

## I. Damages

56. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to:

(a) Back pay representing the loss of Plaintiff's $285,000 annual salary from February 13, 2026 through his commencement of new employment in April 2026, an amount of approximately $47,500;

(b) Unpaid prorated 2025 incentive bonus earned during Plaintiff's active employment from September through December 2025, in the amount of approximately $23,750;

(c) Contractual notice period pay of $71,250.40 representing 90 days' salary continuation under Section 6.1 of the employment agreement;

(d) Front pay representing the ongoing annual salary differential of $25,000 between Plaintiff's prior ArchWell compensation ($285,000) and his current compensation ($260,000 annually), projected over a reasonable future period;

(e) Compensatory damages for emotional distress, anxiety, professional uncertainty, and physical manifestations of occupational stress, including gastrointestinal symptoms requiring a colonoscopy on April 9, 2026, with associated out-of-pocket medical costs of $3,200, attributed by Plaintiff's treating gastroenterologist to occupational stress;

(f) Punitive damages under 42 U.S.C. § 1981, for which there is no statutory cap;

(g) Attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988; and

(h) Such other and further damages as may be proven at trial.

## V. CAUSES OF ACTION

## COUNT I -- RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000e et seq.)

57. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

58. Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee in the terms, conditions, or privileges of employment because of the employee's race.

59. Plaintiff is a Black male and a member of a protected class under Title VII.

60. Plaintiff was qualified for his position as a primary care physician with Defendants and performed his duties satisfactorily throughout his employment.

61. Plaintiff suffered an adverse employment action when Defendant Employer terminated his employment on February 13, 2026.

62. Defendants treated Plaintiff less favorably than similarly situated non-Black employees. Medical assistants' race-based complaints about Plaintiff's "tone," "body language," and "head movements" were credited and acted upon without investigation, while Plaintiff's documented complaints about the same medical assistants' clinical failures produced no disciplinary response.

63. Defendants' stated reason for terminating Plaintiff -- the CVS prescribing restriction -- is pretextual for the reasons set forth in paragraphs 52 through 56 above. The restriction predated Plaintiff's employment, was known to Defendant Employer's management and accepted as "fine" by Plaintiff's direct supervisor, and was followed by Defendants' investment in Plaintiff's attendance at company-wide orientation one week before his termination.

64. Defendants' shifting and inconsistent justifications for Plaintiff's termination -- citing Section 6.3(b) in the termination letter and Section 6.3(j) verbally through counsel -- further evidence pretext and discriminatory motive.

65. Defendants' discriminatory conduct was intentional and done with malice or reckless indifference to Plaintiff's federally protected rights.

## COUNT II -- HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII (42 U.S.C. § 2000e et seq.)

66. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

67. Plaintiff is a member of a protected class by virtue of his race (Black) and national origin (Nigerian).

68. Plaintiff was subjected to unwelcome harassment based on his race and national origin, including: race-based complaints about his "tone," "body language," and "head movements" rooted in a medical assistant's disclosed trauma specifically directed at Black men; statements that he "won't be here much longer"; repeated dismissal of his documented complaints about clinical insubordination; and management's attribution of his hostile work environment complaints to his own "body language and head movements."

69. The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. The conduct persisted from approximately November 2025 through February 2026, involved multiple individuals, included threats to Plaintiff's professional standing, and culminated in Plaintiff's termination.

70. A reasonable person in Plaintiff's position would find the work environment hostile and abusive.

71. Defendants knew or should have known of the harassment through Plaintiff's formal written complaints of January 9 and January 17, 2026, and his in-person meeting on January 20, 2026, yet failed to take prompt, effective remedial action.

## COUNT III -- RETALIATION IN VIOLATION OF TITLE VII (42 U.S.C. § 2000e-3(a))

72. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

73. Plaintiff engaged in protected activity under Title VII by reporting race-based discrimination and a hostile work environment to his supervisor on January 9, 2026, by filing a formal written complaint on January 17, 2026, and by raising these concerns at a meeting on January 20, 2026.

74. Plaintiff suffered an adverse employment action when Defendants terminated his employment on February 13, 2026 -- twenty-seven (27) days after his formal written protected complaint of January 17, 2026.

75. A causal connection exists between Plaintiff's protected activity and his termination. The temporal proximity of 27 days between the formal complaint and termination raises a strong inference of retaliation. Additionally, the stated termination reason -- the CVS restriction -- had been known to Defendants for over a month without adverse action, and Plaintiff's termination was precipitated by a complaint from the same medical assistant who had been the subject of Plaintiff's documented harassment reports.

76. Defendants' retaliatory conduct was intentional and done with malice or reckless indifference to Plaintiff's federally protected rights.

## COUNT IV -- RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

77. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

78. Section 1981 of the Civil Rights Act of 1866 prohibits race discrimination in the making and enforcement of contracts, including employment contracts.

79. Plaintiff, as a Black male of Nigerian national origin, is a member of a racial minority protected under 42 U.S.C. § 1981.

80. Defendants discriminated against Plaintiff on the basis of race in the terms, conditions, and termination of his employment contract, as set forth in paragraphs 25 through 56 above.

81. Defendants acted with malice or reckless indifference to Plaintiff's rights under 42 U.S.C. § 1981. Claims under Section 1981 carry no statutory cap on compensatory or punitive damages.

82. Plaintiff's Section 1981 claim is subject to a four-year statute of limitations under 28 U.S.C. § 1658 and is timely filed.

## COUNT V -- HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1981

83. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

84. Defendants subjected Plaintiff to a racially hostile work environment in violation of 42 U.S.C. § 1981, as described in paragraphs 25 through 39 above.

85. The hostile work environment was based on Plaintiff's race and national origin, was severe and pervasive, was known to Defendants' management, and was not remedied despite Plaintiff's repeated formal complaints.

## COUNT VI -- RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

86. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

87. Plaintiff engaged in protected activity under 42 U.S.C. § 1981 by complaining of race discrimination and hostile work environment on January 9, January 17, and January 20, 2026.

88. Defendants retaliated against Plaintiff by terminating his employment twenty-seven (27) days after his formal written protected complaint, using a pretextual justification that had been known to and accepted by Defendants' management for over a month without adverse consequence.

## COUNT VII -- RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT (Fla. Stat. § 760.10)

89. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

90. The Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10, prohibits discrimination in employment on the basis of race, color, and national origin, and prohibits retaliation against employees who engage in protected activity.

91. Defendants' conduct as described herein constitutes race discrimination, hostile work environment, and retaliation in violation of the FCRA, which is construed in conformity with Title VII. Plaintiff dual-filed his EEOC charges with the Florida Commission on Human Relations, satisfying the FCRA's administrative prerequisite.

## COUNT VIII -- BREACH OF CONTRACT (90-Day Notice Period) Against Defendant ArchWell Health Medical of Florida, LLC

92. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

93. The Physician Employment Agreement between Plaintiff and Defendant ArchWell Health Medical of Florida, LLC, executed July 21, 2025, constitutes a valid and enforceable written contract.

94. Section 6.1 of the employment agreement provides that termination without cause requires "at least 90 days (but no more than 95 days) prior written notice" with continued salary and benefits during the notice period.

95. Defendant Employer terminated Plaintiff's employment immediately on February 13, 2026, without providing the required 90-day written notice or continued compensation during the notice period.

96. Even if Defendants' termination is deemed to have been for cause under Section 6.3, Section 6.2 required written notice of the alleged breach and a 30-day cure period before termination. Defendants provided neither.

97. Defendant Employer's failure to provide the contractually required notice period and continued compensation constitutes a material breach of contract. Plaintiff is entitled to 90 days' salary continuation at the rate of $285,000 annually, totaling $71,250.40.

## COUNT IX -- BREACH OF CONTRACT (Prorated 2025 Incentive Bonus) Against Defendant ArchWell Health Medical of Florida, LLC

98. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

99. Exhibit B of the employment agreement provides for an annual incentive bonus of up to 20% of Plaintiff's base salary ($57,000 maximum), "paid between January 1 and March 31 of each year."

100. Plaintiff was actively employed by Defendant Employer from September 22, 2025 through February 13, 2026, a period that includes four full months of the 2025 contract year (September through December 2025).

101. Plaintiff earned a prorated share of the 2025 incentive bonus through his active employment and service during the September through December 2025 period, representing an amount of approximately $23,750 (four months of the $57,000 maximum annual bonus).

102. Defendant Employer has failed and refused to pay Plaintiff's prorated 2025 incentive bonus. Defendant Employer may not avoid its obligation to pay compensation earned during Plaintiff's active employment by the act of terminating his employment -- particularly where that termination is itself alleged to be unlawful retaliation for protected activity.

103. Defendant Employer's failure to pay the earned prorated bonus constitutes a material breach of contract.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bamidele Olatunbosun, M.D. respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, and grant the following relief:

(a) A declaration that Defendants' conduct violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Florida Civil Rights Act;

(b) Back pay, with interest, representing wages and benefits lost from February 13, 2026 through the date of judgment;

(c) The prorated 2025 incentive bonus of approximately $23,750, representing compensation earned during Plaintiff's active employment from September through December 2025;

(d) Contractual notice period compensation of $71,250.40 plus applicable benefits;

(e) Front pay representing the ongoing salary differential between Plaintiff's prior ArchWell compensation ($285,000) and current compensation ($260,000), over a reasonable future period as determined by the Court;

(f) Compensatory damages for emotional distress, pain, suffering, and physical manifestations of occupational stress, in an amount to be determined by the jury;

(g) Punitive damages under 42 U.S.C. § 1981, in an amount sufficient to punish Defendants and deter similar conduct, for which there is no statutory cap;

(h) Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988;

(i) Pre- and post-judgment interest as permitted by law;

(j) Such other and further relief as this Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*Bamidele Olatunbosun*

_____

Bamidele Olatunbosun, M.D.

Plaintiff, Pro Se

2905 W. Fountain Blvd.

Tampa, Florida 33609

Telephone: (510) 407-4473

Email: bami.olat@gmail.com

Date: ___07/08/2026_____

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth above, I filed the foregoing Complaint with the Clerk of the United States District Court for the Middle District of Florida, Tampa Division, and served a copy upon Defendants via process server upon their Florida registered agent.

*Bamidele Olatunbosun*

_____

Bamidele Olatunbosun, M.D.